**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NIA LUCAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-0296 (ABJ) |
| | ) | |
| KELLY LOEFFLER | ) | |
| *Administrator,* | ) | |
| *U.S. Small Business Administration (SBA)*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

On February 1, 2021, plaintiff Nia Lucas brought this action against Kelly Loeffler, the Administrator of the U.S. Small Business Administration ("SBA"), pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*.  Compl. [Dkt. #1]; Am. Compl. [Dkt # 70].[1] Plaintiff seeks compensation for overtime hours she claims she worked on one day during the January 2018 federal government shutdown.  The number of overtime hours she seeks to be paid for has fluctuated between two and five hours throughout the litigation, and her current claim amounts to approximately $361.30, plus liquidated damages and interest.  Am. Compl. at 14. Plaintiff has filed a series of related lawsuits related to her brief employment at the SBA and the overtime dispute, suing not only the SBA, but also her union and the lawyer who represented her when this case was first filed.  *See Lucas v. Guzman*, No. 22-2101, 2024 WL 4650944 (D.D.C.

---

[1]    The suit was originally brought against Tami Perriello, the former acting SBA Administrator.  Under Federal Rule of Civil Procedure 25(d), the subsequent SBA Administrator Isabella Casillas Guzman was substituted as defendant.  The current SBA Administrator Kelly Loeffler was later substituted as the current defendant.

1

Nov. 1, 2024) ("*Lucas II*"); *Lucas v. Dhali*, No. 24-0685, 2025 WL 3771999 (D.D.C. May 29, 2025); *Lucas v. Loeffler*, No. 23-3535 (D.D.C.) ("*Lucas III*"); *Lucas v. AFGE*, No. 22-777; and *Lucas v. AFGE*, No. 22-1540.

The original complaint in this action consisted of two counts. Plaintiff alleged that defendant violated the FLSA by: (1) "intentionally refus[ing] to pay [plaintiff] her wages" for two hours of overtime work during the government shutdown and (2) unlawfully retaliating against her for inquiring about when she would be paid. Compl. ¶¶ 18, 23–29, 30–35. The Court granted in part and denied in part defendant's motion to dismiss, which permitted the unpaid wages claim to proceed but dismissed the retaliation claim. *See Lucas v. Guzman*, No. 21-0296, 2022 WL 2064852, at *8–9 (D.D.C. June 8, 2022) ("*Lucas I*"). It found that there was a genuine dispute of material fact in the record at that "early juncture" as to whether plaintiff had released her unpaid wages claim in a settlement agreement she signed with the SBA in March 2020. *Id*. At the time the motion to dismiss was considered, there was "nothing in the record" to establish that plaintiff's Amended Grievance, which squarely raised plaintiff's claim of unpaid wages for work on January 22, 2018, was "existing" or "pending" at the time the settlement agreement was signed. *Id*. at *8.

Plaintiff subsequently filed an amended complaint, which is now the operative complaint in the case. [Dkt. # 70]. Plaintiff continues to press her unpaid wages claim under FLSA (Count I), but she has increased the number of overtime hours she claims to have worked during the shutdown from two to five, consisting of two unpaid hours of "orderly shutdown activities" and three hours of "furlough" pay because, according to her alternative work schedule, she was scheduled to not be working at all on that particular day. *See* Am. Compl. ¶¶ 37–43. She also brings another unlawful retaliation claim (Count II), claiming that she was "removed from federal

2

service" and constructively discharged for making formal and informal complaints seeking information about when she would be paid. *See* Am. Compl. ¶¶ 44–48.

The parties have each moved for summary judgment, and the motions are fully briefed. Plaintiff's Partial Motion for Summary Judgment ("Pl.'s Mot.") [Dkt. # 76]; Memorandum of Law in Support of Pl.'s Mot. (Pl.'s Mem.) [Dkt. # 76-1]; Plaintiff's Statement of Material Facts ("Pl.'s SMF") [Dkt. # 76-2]; Motion for Summary Judgment and Memorandum in Support and Opposition to Pl.'s Mot.; ("Def.'s Mot.") [Dkt. # 78]; Defendant's Combined Statement of Material Facts As To Which There Is No Genuine Dispute and Response to Pl.'s SMF ("Def.'s SMF") [Dkt. # 78-1]; Plaintiff's Consolidated (1) Opposition to Def.'s Mot.; (2) Cross-Mot. for Summary Judgment on Count II; and (3) Reply in Support of Pl.'s Mot. ("Pl.'s Opp.") [Dkt. # 84].[2] Although plaintiff has been represented by counsel at various points in this litigation, she is currently proceeding *pro se*. Pl.'s Resp. to Order to Show Cause (Jan. 21, 2026) [Dkt. # 83]. For

---

2      On November 24, 2024, defendant filed a Notice of Controlling Authority [Dkt. # 72] ("Notice"), informing the Court that although defendant's "position in this litigation is that the Court has jurisdiction to hear [p]laintiff's FLSA claim pursuant to 28 U.S.C. 1331 or 28 U.S.C. 1337," the D.C. Circuit's holding in *Waters v. Rumsfeld*, 320 F.3d 265 (D.C. Cir. 2003), may "suggest" the Court lacks jurisdiction. In *Waters*, the D.C. Circuit held that jurisdiction to hear FLSA claims depends on the Tucker Act, which would require FLSA claims to be brought either in the Court of Federal Claims, or in the federal district where plaintiff resides, subject to a $10,000 limit. 320 F.3d at 270–72. Defendant submits that *Waters* may no longer be good law following the Supreme Court's decision in *United States v. Bormes*, 568 U.S. 6, 16 (2012). In *Bormes*, the Court concluded that the Tucker Act did not waive the United States' sovereign immunity for a damages claim against the United States under the Fair Credit Reporting Act. *Id*. Defendant "believes that Bormes (decided in 2012) would cause the D.C. Circuit to reconsider its holding in Waters (decided in 2003)." Notice at 3. Absent D.C. Circuit authority on this issue, other courts in this District have decided that *Bormes* did not change the longstanding understanding that the Court of Federal Claim has exclusive authority to hear FLSA claims seeking more than $10,000. *See, e.g., Alston v. Bethea*, Civ. No. 22-3595 (JEB), 2023 WL 4198203, at *3 (D.D.C. June 27, 2023). The Court finds that reasoning persuasive, and in any event, the amount of wages sought falls well under $10,000.

the reasons set forth below, plaintiff's partial motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

## BACKGROUND

The factual background of this case is detailed in the Court's memorandum opinion granting in part and denying in part the motion to dismiss. *See Lucas I*, 2022 WL 2064852, at *2–4. Therefore, the Court will only recite facts here that are relevant to the claims alleged in the amended complaint.

Nia Lucas was employed as a program analyst in the Office of Women's Business Ownership within the SBA from 2017 until 2020. *See* Pl.'s SMF ¶¶ 1, 3. On November 9, 2017, her request for full-time telework as a reasonable accommodation for a disability was approved. Pl.'s SMF ¶ 5; Def.'s SMF ¶ 5. Plaintiff was a member of the American Federation of Government Employees Local 228 (the "Union"). Def.'s SMF ¶ 12. The Master Labor Agreement between the Union and the federal government provided that "no employee should work overtime unless it's authorized and officially approved in advance by the appropriate . . . supervisor or their designee." Pl.'s SMF ¶ 13. Under this policy, plaintiff's requests for overtime had to be approved by someone more senior than her immediate supervisor. *Id*. ¶ 14.

Plaintiff was instructed several times during her employment that she needed to obtain prior approval before performing overtime work, including:

- On September 22, 2017, plaintiff was told that she must request overtime in advance under the SBA's Standard Operating Procedures ("SOP"). Def.'s SMF ¶ 15, citing Ex. 14 to Def.'s Mot. (September 22, 2017 email from Bruce Purdy to Nia Lucas) ("I also need to remind you that overtime must be requested and approved in advance per SBA's SOP.").

- On November 9, 2017, the SBA sent plaintiff a letter approving her request for telework as a reasonable accommodation, stating: "As you

> are on a gliding schedule, you need to notify me when you are working. You are not permitted to work overtime without prior approval or outside of the hours established in . . . the [Union's] Master Labor Agreement."  Def.'s SMF ¶ 15, citing Ex. 15 to Def.'s Mot. (Nov. 9, 2017 letter from Bruce Purdy to Nia Lucas).

- On three separate occasions, Plaintiff signed telework agreements, which contained a provision stating, "[e]mployee agrees to work overtime or compensatory time only when approved by the supervisor in advance and understands that overtime will not be compensated without such approval."  Def.'s SMF ¶ 15, citing Exs. 16, 17, and 18 (January 17, 2017; February 7, 2017, and November 17, 2017 telework agreements).

- On December 18, 2017, plaintiff's supervisor informed her: "As I stated to you in an email on December 14th, you are not permitted to work overtime or outside of your hours without prior approval."  Def.'s SMF ¶ 15, citing Ex. 19 (Dec. 18, 2017 email from Bruce Purdy to Nia Lucas).

Also, as part of the reasonable accommodation authorizing her full-time telework, plaintiff was required to check in via email so her supervisors would know when she was working.  Def.'s SMF ¶ 16, citing Exs. 15, 20.

In 2017, as part of the approval process for the telework agreement, plaintiff chose to work an "alternative work schedule" ("AWS").  According to her AWS, during each two-week pay period, she worked nine hours for eight days and eight hours on one day (every other Friday), and thus had a day every other week where she was not scheduled to work ("AWS Day").  *Id*. ¶ 5.

Due to a lapse in federal funding, much of the federal government, including the SBA, was shut down from Saturday, January 20 through Monday, January 22, 2018.  Pl.'s SMF ¶ 8.  Plaintiff was furloughed during this period.  Pl.'s SMF ¶ 10.  Because Monday, January 22, 2018 was plaintiff's AWS Day, she had not been scheduled to work that day at all.  And plaintiff did not request or receive approval to do overtime work on that day.  Ex. 23 to Def.'s Mot. at 192.

Over the course of the three-day shutdown, though, the SBA issued a series of guidance documents to employees, some of which were somewhat inconsistent, regarding work during the shutdown. *See* Ex. 24 at 12 (Notice from SBA to employees: "[o]rderly termination activities should take, at most, 4 hours."); Ex. 25 to Def.'s Mot. at 14 (In a letter from the SBA to plaintiff: "[b]ecause you are not engaged in one of the SBA's excepted functions, you are being placed in a furlough status effective January 20, 2018, once you have completed an orderly shutdown of your work, which should take no longer than three hours."); Ex. 26 to Def.'s Mot. at 20 (SBA "Detailed Instructions: Furlough 2018" stating that Phase 1 of shutdown work is "anticipated to last approximately 4 to 5 hours").

Plaintiff maintains that she performed "orderly shutdown activities as instructed" on January 22, and was then furloughed for the rest of the day. Pl.'s SMF ¶ 13.[3] She alleges that because the shutdown occurred on her AWS Day, her AWS day was "cancelled" and she was therefore furloughed for a nine-hour day, which consisted of six hours of actual work plus three hours of furlough time. *Id* ¶¶ 12–13. That day, Congress passed legislation restoring appropriations and the federal government resumed operations, directing federal civilian employees to return to duty, and providing retroactive compensation for all furloughed federal employees for the period of the lapse in appropriations. Pl.'s SMF ¶ 14.

---

3    Defendant disputes plaintiff's assertion that she worked for six hours on January 22, 2018. *See* Def.'s SMF ¶ 13 ("Plaintiff's actual work performing shutdown activities appeared to take slightly more than two hours."). Defendant contends that plaintiff first logged on later than she claims, and that she spent the time that day reading emails, texting colleagues, and reading (and re-reading) the agency's shutdown guidance. *See* Def.'s Mot. at 21.

On January 31, 2018, plaintiff submitted a grievance through her union, #1-31-2018-1, SBA/AFGE ("American Federation of Government Employees"), raising a number of complaints. *See* Grievance Form, Ex. 21 to Def.'s MSJ. [Dkt. # 78-6] ("January 2018 Grievance").  In the form, she complained about the conduct of her supervisor, Bruce Purdy, from the period of January 16, 2018, through the date of the filing of the grievance:

> From January 16, 2018 and continuing today Mr. Purdy denied Ms. Lucas her with-in grade increase.  From January 19, 2018 and continuing until today Mr. Purdy excessively monitors Ms. Lucas, she is made to clock in and out throughout the day with a team lead and Mr. Purdy forces contact with her at least twice a day which is not work related, Ms. Lucas has repeatedly asked him to stop.  This is unlawful and similarly situated employees are not treated the same[].  During this time frame Mr. Purdy has threatened her with personnel action if he is unable to monitor her via Microsoft Lync while she is on reasonable accommodations . . . Mr. Purdy demands that Ms. Lucas deliver to him unfettered access to her medical diagnosis and . . . provided Ms. Lucas' co-worker(s) access to her medical documents . . . . [H]e denied Ms. Lucas training directly related to her work in SBA, training which he has approved for similarly situated employees. Also . . . Mr. Purdy has denied Ms. Lucas access to her Official Personnel Folder . . . and all other records in his possession.  Additionally, [f]rom January 16, 2018 Mr. Purdy has against the law has [sic] denied all official time in the month of January and ongoing for Ms. Lucas to have official time to amend and confer with counsel on the outstanding EEO complaint against him.

January 2018 Grievance at 1.  The relief she sought included, among other things, "that Ms. Lucas . . . BE MADE WHOLE," "that Ms. Lucas . . . retroactively receive her Wage Grade Increase," "Back pay, TSP [thrift savings plan] contributions, all with Interest," and "Medical Hardship Relief."  *Id.*  In response to the question on the form asking what contractual or legal provisions had been violated, plaintiff listed thirty-eight separate provisions, including twenty-two different articles of the 2017 Master Labor Agreement, the SBA policy against sexual harassment, HIPAA ("Health Insurance Portability and Accountability Act"), and "FLSA Violation."  *Id.* at 2.

On February 2, 2018, plaintiff emailed Denise Edmonds, an SBA Office Automation Assistant and Timekeeper, inquiring about payment for the overtime work she performed on January 22, 2018. Ex. G to Pl.'s Mot. [Dkt. # 76-3] at 31–38. In response to plaintiff's claim that she should be paid for six hours of overtime work, Ms. Edmonds informed plaintiff on February 6, 2018, that she would be paid "for 4 hrs only." *Id*. at 35. Edmonds included Purdy on the email chain to confirm the accuracy of her response, and on February 6, 2018, he stated: "[d]uring the furlough, employees were only allowed to work on shut down activities. In conferring with HR, 4 hours is what is considered reasonable for the shut down activities." *Id*. at 33.

On February 9, 2018, Lucas sent an email with the subject line "Manipulation of Time Sheet and Forced Overtime" to a number of individuals, including her union representative, stating:

> I would like the grievance to include *manipulation of timesheet* and *forced overtime without compensation on 1/22/[2018]*. I worked 6 hours, and Bruce and Denise Edmonds colluded to change the time that I actually entered which was 6 hours (6am to 12 noon). They changed it to 4 hours saying this is reasonable versus making me whole as furlough guidance states.

Email from Nia Lucas to Eric Fuller (Feb. 9, 2018), Ex. H to Pl.'s Mot. at 40 (emphasis in original).

8

On February 15, 2018, plaintiff was paid for the pay period that included the furlough: January 21, 2018 to February 3, 2018.  She was paid for 84 total hours of work, including 63.50 of regular work, 4 hours of overtime, 11 hours of sick leave, and 5.5 hours of other leave.  *See* Ex. I to Pl.'s Mot. [Dkt. # 76-3].  The four hours of overtime pay that plaintiff received was for the work she completed on her AWS Day.  None of plaintiff's colleagues received overtime pay for that pay period.  Ex. 1 to Def.'s Mot. [Dkt. # 78-3] at 105:8–19 ("Lucas Dep.") (agreeing that she was the only employee paid overtime); Ex. J to Pl.'s Mot. [Dkt. # 76-3] at 44–52; Ex. I to Pl.'s Mot. [Dkt. # 76-3] at 42–43.

On February 24, 2018, plaintiff amended her grievance, designated as, "1-31-2018-1: Addendum 2-14-2018."   Ex. 31 to Def.'s Mot./Opp. [Dkt. # 78-6] at 56–59 ("Amended Grievance").  The Amended Grievance adds to the list of reasons "why the complaint should be considered a grievance" that plaintiff was "denied her Overtime for Time and Attendance Pay Period 2."  *Id*. at. 57.  The Amended Grievance again sought that "Ms. Lucas . . . BE MADE WHOLE" and receive "[b]ack pay, TSP contributions, all with interests" and "back pay due to unjustified personnel action Violation of OPM Federal Employee Antidiscrimination and Retaliation Act").  *Id*. at 57–58.  And plaintiff resubmitted the single spaced list of thirty-eight contractual provisions and other rules and regulations that were allegedly violated, including the FLSA.  *Id*.

On February 27, 2018, the SBA responded to the Grievance and Amended Grievance.  Ex. 19 to Compl., *Lucas v. Guzman*, Civil Action No. 24-cv-0817 [Dkt. # 1-19] "SBA Response to

9

Am. Grievance").[4]   Plaintiff's supervisor at the SBA wrote in a section entitled "Response to Grievance # 1-31-18 – Addendum 1 2-14-18":

> In regards to the claim that I denied overtime for pay period 2018-2, this statement is false.  The agency appropriately compensated you with 4 hours overtime as no employee was legally permitted to work past 12:00PM on January 22, 2018 for the orderly shut-down of the Federal government due to a lapse in appropriation.  All SBA employees received information concerning the furlough and orderly shut-down. In fact, you sent me an email on January 22, 2018 at 9:49 am asking 'Bruce, am I supposed to come in today?' You did not begin work at 6:00 am as you claim.

*Id*. at 3–4.  The response concluded that "[i]t is my decision to deny the grievance and any related grievances that may be filed on the same issue and to not grant the relief requested."  *Id*. at 4.

Three months later, on May 18, 2019, the SBA sent plaintiff official notice that the agency was proposing to remove her from her position for "threatening [her] supervisor with legal action" and "lack of professional conduct" in her email communications with other agency staff during the period between December 27, 2017 and January 25, 2018.  Ex. 35 to Def.'s Mot. [Dkt. # 78-6] at 93–100.

In March 2020, plaintiff and the SBA entered into a Settlement and Release Agreement ("Settlement Agreement").  Ex. 51 to Def.'s Mot./Opp.  [Dkt # 78-7] at 57–68. Agreement (effective as of March 9, 2020); Def.'s SOF ¶ 3.  Plaintiff was represented by an attorney named Tamara L. Miller, who also signed the Settlement Agreement.  Settlement Agreement at 10. Pursuant to the Settlement Agreement, plaintiff agreed to:

> withdraw, with prejudice, any and all existing actions against the Agency that she may have pending before the Agency, the Merit Systems Protection Board, the Equal Employment Opportunity Commission, the Office of Special Counsel, or any other administrative or judicial forum, and any

---

4       *See Dupree v. Jefferson*, 666 F.2d 606, 608 n.1 (D.C. Cir. 1981) (identifying "related proceedings in other courts" among those matters of which the Court may take judicial notice).

grievances she may currently be pursuing against the Agency or any legacy component, therein, whatsoever, that she may have pending against the Agency at the time she signs this Settlement Agreement, including, but not limited to . . . SBA Union Grievance 1-31-2018-1, and any associated arbitration [and] SBA Union Grievance 228-2-25-2019-MA-1, and any associated arbitration . . . .

*Id.* ¶ 6. Plaintiff also agreed that the SBA would remove her from federal service for "medical inability to perform," which is a non-disciplinary removal, within 45 days after the Agreement was executed. *Id.* ¶ 5.

The Agreement also contains a release clause:

> Upon the Effective Date of the Agreement, Complainant shall and hereby does settle, release, hold harmless, and forever discharge the SBA and its officials, employees, officers, agents, and representatives from all claims contained within any of the matters or forums identified in Paragraph 6 and its subparagraphs, as well as any and all other claims, demands, rights or causes of action, however designated, and all other claims and liabilities whatsoever, whether known or unknown, pending or not now pending, contingent or fixed, that Complainant has had, now has or hereafter may have against the SBA and its officials, employees, officers, agents, and representatives as of the date of this Agreement.

Agreement ¶ 11. In exchange for the release of claims, the SBA agreed to:

- "pay a lump sum payment in the amount of eighty thousand dollars ($80,000.00) . . . to Nia Lucas," *id.* ¶ 1;

- "waive the requirement that Complainant repay any negative sick leave balance or negative annual leave balance," *id.* ¶ 2;

- "convert six hundred and thirty-one (631) hours of Complainant's time recorded as leave without pay . . . to paid on-duty Administrative Leave," and to provide her with "backpay for the hours converted," *id.* ¶ 3;

- not "appeal or dispute the Department of Labor's November 19, 2019 decision to accept Complainant's claims for Post-Traumatic Stress Disorder (PTSD) injury," and to process all forms and documents related to her Federal Employees' Compensation Act claim expeditiously, *id.* ¶ 4;

- "remove Complainant for Medical Inability to Perform," *id.* ¶ 5; and

11

- "reverse Complainant's charge of Absent Without Leave . . . dated December 5, 2017," and provide her with backpay for the hours reversed, *id.* ¶ 7.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d

12

1144, 1147 n.4 (D.C. Cir. 1989) (alteration in original), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).  In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

Plaintiff moves for partial summary judgment on her claim for unpaid wages under FLSA (Count I), arguing that there is no genuine dispute of material fact that she was owed, and "willfully not paid by SBA," regular and overtime compensation for work performed during the furlough.  Pl.'s Mot. at 7.   In the current iteration of the claim, plaintiff alleges she is owed for five hours of work (two hours of unpaid overtime work and three hours of furlough pay).  Am. Compl. ¶¶ 37–43.  The SBA determined that only four hours of "orderly shutdown work" was reasonable, and that she would not be paid for any additional time that day.  Plaintiff contends, though, that this determination "directly violated the requirements of the FLSA, which requires employers to pay overtime rates to employees for all compensable overtime work completed."  Pl.'s Mot. at 10, citing 29 U.S.C. § 207; 5 U.S.C. § 6128(a)–(b).

Defendant moves for summary judgment on both the unpaid wages claim and the retaliation claim.  Defendant contends first that plaintiff's wages claim is time-barred under FLSA's general two-year statute of limitations, or in the alternative, under the three-year statute of limitations for willful violations.  Def.'s Mot. 17–20.  Defendant also argues that both of plaintiff's claims are barred by the March 2020 Settlement Agreement.  *Id*. at 42–45.  Finally, defendant maintains that there is no dispute of genuine material fact that would enable a reasonable jury to find, that plaintiff was entitled to additional pay for her work during the government shutdown.  *Id*. at 21–28, 29–41.

### I.    Count I is Barred by the Statute of Limitations.

Any action under the FLSA for unpaid wages must be "commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."   29 U.S.C. § 255(a). Willfulness is a "high bar to clear."  *Shea v. United States*, 136 Fed. Cl. 95, 113 (2018).   The burden of proving that an employer willfully failed to comply with the law falls on the employee. *Abbey v. United States*, 106 Fed. Cl. 254, 265 (2012).  An employer's conduct is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1031 (D.C. Cir. 2016), quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ("The word willful is considered synonymous with such words as voluntary, deliberate, and intentional.").

Plaintiff's cause of action for unpaid wages accrued on February 15, 2018, the date she was paid for four hours of work during the government shutdown.  *Figueroa I v. D.C. Metro. Police Dep't*, 633 F.3d 1129, 1135 (D.C. Cir. 2011) (finding that FLSA claims accrue with each pay period).   Under the FLSA's general two-year statute of limitations, then, any lawsuit seeking unpaid wages must have been filed by February 15, 2020.   Plaintiff filed this lawsuit on February 1, 2021, nearly a year later. *See* Compl.  Therefore, her unpaid wages claim is time barred unless she has put forth facts to show that defendant committed a "willful violation."

Plaintiff advances two theories for why defendant's conduct should be considered willful. First, she claims that defendant was "fully aware" of the alleged FLSA violation because she "made several formal and informal complaints," and the SBA's failure to rectify the problem she

had identified was therefore willful.  Pl.'s Mot. at 12.[5]  Second, plaintiff contends that defendant's

conduct towards her was willful because it "concurrently paid other employees . . . their full wages

for the same period."  Pl.'s Mot. at 12–13.

---

5        Defendant submits that because plaintiff has changed her legal position over time as to the
number of hours that were unlawfully unpaid, the SBA was not "on notice of the theory she now
presses."  Def.'s Mot. at 18-19.  That contention is not supported by the record.

In her original complaint in 2021, plaintiff alleged that the SBA owed her for two hours of
unpaid work.  Compl. ¶ 15 (alleging she was owed for six hours total, four of which were paid in
her February 15 paycheck, leaving two hours unpaid); *see also* Compl. ¶ 19.   Plaintiff filed an
amended complaint in 2024 which asserted:

> SBA then paid Lucas for just four hours of work on January 22,
> 2018; it did so at the overtime rate . . . SBA therefore willfully failed
> to pay Lucas for five hours of work on January 22, 2018 to which
> she was entitled to be paid at the overtime rate (approximately
> $361.30).

Am. Compl. ¶ 24; *see also* Am. Compl. ¶ 39 (the "SBA willfully failed to compensate Lucas at all
for five hours of time she worked on January 22, 2018 (two hours of orderly shutdown activities
and three hours of furlough).").

While it is true that plaintiff's demand has increased, the gravamen of the FLSA claim
remains the same as the concern she raised immediately after the shutdown:  that the four hours of
overtime was insufficient.  *See, e.g.*, Def.'s SMF ¶ 42 ("On February 2, 2018, plaintiff asked about
her compensation for January 22."); Def.'s SMF ¶ 43 ("On February 6, 2018, plaintiff asked the
timekeeper again.").   And on February 14, 2018, plaintiff formally amended her grievance to
include the claim.  Def.'s SMF ¶ 51, citing Ex. 31 to Def.'s Mot. at 206 (amended grievance
alleging plaintiff was "denied her Overtime for Time and Attendance Pay Period 2.").  So, the
evolution of plaintiff's theory does not bear on whether any violation of the FLSA was willful.

But all of that is beside the point.  Even if plaintiff has shown that the SBA was
intentionally paying an amount less than she asked for, that does not mean it was intentionally
withholding an amount she was owed and thereby violating the FLSA.  The adjective "willful" in
the statute does not stand alone, but it is paired with and modifies the noun that comes after:
"violation."  29 U.S.C. § 255(a).

Neither of these contentions meet the high standard necessary for invoking the exception to the two year statute of limitations. Section 255 requires proof of a "willful *violation,*" not merely proof of willful conduct. The fact that plaintiff made multiple formal and informal complaints to the SBA about her concerns does not bear on the question of whether the SBA knowingly or recklessly disregarded its legal obligations when it determined that four hours was a reasonable amount of time to be expended performing orderly shutdown activities. The fact that plaintiff disagreed with the agency's decision does not somehow transform it into a "voluntary, deliberate, [or] intentional" violation, *McLaughlin*, 486 U.S. at 133; plaintiff has pointed to nothing in the record to show that anyone at the SBA understood or even suspected that its position was contrary to the FLSA.

Moreover, the record also reflects that, rather than disregarding plaintiff's concerns, defendant responded promptly to her inquiries, took them seriously, and repeatedly explained why she would be paid for four hours of overtime instead of six. *See, e.g.,* Ex. G to Pl.'s Mot. at 36 (February, 6, 2018 email from Human Resources informing plaintiff that she "will get pay for 4 hours only," and "you are not allow[ed] those [6] hours of time for that day").

Plaintiff's assertion that she has shown a willful violation towards her because the SBA paid others for a full day fails as well. To begin with, plaintiff points to no evidence in the record supporting this assertion. Plaintiff received pay for eighty-four hours during Pay Period 2, which included 80 hours of standard pay and leave, as well as four hours of overtime. The undisputed facts show that all of the other employees in her office were also paid 80 hours of standard pay for Pay Period 2, but notably, no one other than plaintiff received any overtime pay. Ex. J to Pl.'s Mot. [Dkt. # 76-3] at 44–52. Plaintiff was the only person for whom January 22, 2018 was an

16

AWS Day, so she was the only person who received any overtime pay at all.  Ex. I to Pl.'s Mot. [Dkt. # 76-3] at 42–43.

Courts have recognized willful FLSA violations when the facts showed that the defendant knew the FLSA applied, and knew their conduct violated the law, but they forged ahead anyway. *See, e.g., Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 286 (D.D.C. 2015) (finding that defendants were familiar with the requirements of FLSA, yet disregarded them); *Galloway v. Chugach Gov. Servs., Inc.,* 199 F. Supp. 3d 145, 151–53 (D.D.C. 2016) (finding that plaintiff had plausibly alleged a willful violation when (1) the employer was aware of its obligation to pay overtime to its employees and refused to do so; (2) employees were frequently forced to work through their meal breaks; (3) employees were not allowed to leave their work stations at the end of their shifts; (4) employees were not permitted to record extra time worked during meals or after their shifts; and (5) the payroll system would not accept entries that resulted in an employee working over 40 hours a week).  Here, the vehemence of plaintiff's disagreement with the amount of her overtime pay is not enough alone to show that the agency intentionally violated the law.

Because plaintiff has not carried her burden of establishing a willful violation, the FLSA's two-year statute of limitation governs.  Therefore, the unpaid wages claim alleged in Count I, which was filed after February 15, 2020, is time barred.

## II.     In the Event the Three-Year Statute of Limitations Applies, Defendant Is Entitled to Summary Judgment on Count One.

Plaintiff has failed to identify any dispute of fact to be tried with respect to whether she was fully compensated for overtime work she performed on January 22, 2018.  Plaintiff's first problem is that she has not shown that she had permission to perform any overtime work that day. The record reflects that plaintiff was instructed several times that she could not work overtime

17

without advance permission, *see* Ex. 14 to Def.'s Mot; Ex. 19 to Def.'s Mot., and she has not pointed to any evidence to show that she followed the protocol in connection with January 22, 2018.

Plaintiff contends, though, that the SBA "ordered employees to report to work and perform 'orderly termination' work, making the shutdown tasks themselves the day's principal work." Pl.'s Opp. at 69. But that theory fails as well. While one could quibble with plaintiff's characterization of the general emails she received as an "order" to perform shutdown tasks,[6] even if one resolved that fact in her favor, the communications cited all placed limits on the number of hours that could be expended for that purpose. So, the four hours of compensation that plaintiff received are consistent with the very documents she relies upon to establish an entitlement to overtime pay at all. Plaintiff can point to no open-ended authorization or directive to take six hours or as much time as she chose, nor has she supplied grounds to find that the agency lacked the discretion to set four hours as the appropriate amount. And the fact that the SBA, in its discretion, already paid her for four hours of overtime work because she worked on her AWS Day, was an unexpected windfall for plaintiff.[7]

---

6    One of the documents plaintiff relies on does not address whether shutdown tasks should be performed at all, but only how long the work should take. Ex. 26 to Def.'s Mot. at 20 ("Phase 1 [of shutdown work] is anticipated to last approximately 4 to 5 hours). While two of the documents can be read to imply that furlough status required shutdown work, both place limits on the number of hours employees were permitted to expend. *See* Ex. 24 to Def.'s Mot. at 12 ("Employees who are subject to furlough are to report to work on Monday, January 22, to provide for the orderly termination of functions . . . Orderly termination activities should take, at most, 4 hours."); Ex. 25 to Def.'s Mot. at 14 ("Because you are not engaged in one of the SBA's excepted functions, you are being placed in a furlough status effective January 20, 2018, once you have completed an orderly shutdown of your work, which should take no longer than three hours.").

7    Even if the unpaid wages claim were not time barred, the Court would find that both of plaintiff's FLSA claims are barred by the March 2020 Settlement Agreement. Defendant raised this argument at the motion to dismiss stage, and the Court found that there was a genuine dispute

of material fact in the record at that "early juncture" regarding whether plaintiff's Amended Grievance was "existing" or "pending" at the time the settlement agreement was signed. *Lucas I*, 2022 WL 2064852, at \*8. Now that the record is more fully developed, there is no question that the Amended Grievance specifically alleging a FLSA violation was filed, and that the SBA had responded to it substantively, in March 2020. *See* Amended Grievance (dated Feb. 14, 2018); SBA Response to Am. Grievance (dated Feb. 27, 2018).

Given this, the plain language of the document strongly supports the conclusion that plaintiff released her FLSA claims. *See* Settlement Agreement ¶ 6. But the question of whether a plaintiff *can* release a FLSA claim, even when a settlement purports to do so, is a more complicated question. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945) (explaining that Congress enacted FLSA to "protect certain groups of the population from substandard wages and excessive hours that can result from the "unequal bargaining power as between employer and employee"). In other words, "protections for employees trump any purported settlement or waiver of the employees' rights to bring suit for FLSA violations." *Carrillo v. Dandan, Inc.*, 51 F. Supp. 3d 124, 128 (D.D.C. 2014).

Although there is no D.C. Circuit precedent on this issue, the Eleventh Circuit has held that there are two exceptions to the general rule the private settlement agreements in a FLSA lawsuit are not enforceable. FLSA back wage or liquidated damages claims may be permitted in (1) a Department of Labor supervised settlement or (2) "a stipulated judgment entered by a court which has determined that a settlement . . . is a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Lynn's Food Stores, Inc. v. Dep't of Labor*, 679 F.2d 1350, 1355 (11th Cir. 1982). But the Settlement Agreement here was not overseen by DOL and it did not receive the imprimatur of any court, taking this case outside the framework set forth in *Lynn's Food Stores*.

As the Court noted in its ruling on motion to dismiss, the Federal Circuit carved out its own exception to the general rule against settling FLSA claims. In *O'Connor v. United States*, it posited that the policy concerns underlying the rule might not apply in situation when federal employees who, pursuant to the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 7121(a)(1), are represented exclusively by a union and relinquish their rights as part of an accord and satisfaction. 308 F.3d 1233, 1236–37 (Fed. Cir. 2002). In its ruling on the motion to dismiss, the Court added as dicta that the *O'Connor* exception would not apply here since plaintiff was represented by a private attorney and not the union during the negotiation of the settlement. *Lucas I*, 2022 WL 2064852, at \*8. However, a decision on that issue was not necessary to the ruling on the motion to dismiss when the record was far less developed than it is now, and the briefing was less robust than what is currently before the Court. So, upon further reflection, the Court withdraws that observation, but it also notes that it need not decide that question as part of this opinion either.

Finally, with respect to the waiver, another court in this district has opined that "a private settlement of FLSA claims may be enforceable, even if the settlement was reached without United States Department of Labor or judicial supervision or approval, but only when the agreement resolves a bona fide dispute between the parties and the terms of the settlement are fair and reasonable." *Sarceno v. Choi*, 66 F. Supp. 3d 157, 172 (D.D.C. 2014). The court in *Sarceno*

**III.     The Settlement Agreement Bars Count Two – the Retaliation Claim.**

In Count II, plaintiff claims that she was retaliated against for inquiring about when she would be paid for her work during the government shutdown.  The FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted any proceeding" under its provisions.  29 U.S.C. § 215(a)(3).  Defendant moves for summary judgment on Count II arguing that (1) plaintiff's retaliation claim is barred by the Settlement Agreement, and (2) the undisputed facts do not establish a prima facie case of retaliation.

Although the D.C. Circuit has not had the opportunity to address the question, courts in other circuits have held that settlement of retaliation claims under the FLSA is treated differently than wage and overtime claims, and that those settlements do not require courts to conduct a fairness review.  *See, e.g., Isonhart v. Step One Auto. CSS, LLC*, Civ. No. 23-010, 2023 WL 7497510, at *1 (S.D. Ga. Nov. 13, 2023) ("[S]ettlement of retaliation claims under the FLSA are not handled in the same manner" as wage and overtime claims under the FLSA.); *Romeo v.*

---

explained that if a court determines that a bona fide dispute exists, it must then consider the "totality of the circumstances surrounding the execution of the Settlement Agreements" by examining:  "(1) whether the employer is overreaching to secure a waiver of rights; (2) whether the settlement was reached by arms' length negotiation; and (3) whether the plaintiffs would have difficulty obtaining a judgment."  *Id.* (internal quotation marks omitted).

In the Court's view, all of those factors would pertain here.  There is no evidence that defendant was "overreaching" to secure a waiver of rights, given plaintiff's history of asserting her rights, and the facts that the Settlement Agreement was the result of arms-length negotiations between plaintiff and the SBA and that plaintiff was represented by an attorney, who also signed the agreement.  And with respect to "the difficulty of securing a judgment," the Court looks to "the circumstances as they existed at the time the Agreement[] was signed."  *Sarceno*, 66 F. Supp. 3d at 177.  Given that the statute of limitations had already lapsed by the time the Settlement Agreement was reached, any claim would have faced an uphill battle.  The Court notes, though, it need not reach this question either, given its ruling on the statute of limitations and the merits of the claim.

*Colonial Imports, Ltd.*, Civ. No. 16-cv-876 , 2016 WL 7644854 at *1 n.1 (finding that the parties "settled and dismissed" the claim for retaliation under the FLSA, as "they do not require court approval for settlement"); *Batts v. City of Los Angeles,* Civ. No. 06-0843, 2010 WL 11595885, at *5 n.7 (C.D. Cal. Aug. 12, 2010) ("[T]he requirements of notice, disclosure and Secretary of Labor supervision only apply to claims for wages brought pursuant to 29 U.S.C. § 216(c).") (emphasis omitted).

The Court concludes that the Settlement Agreement between plaintiff and the SBA bars the FLSA retaliation claim alleged in Count II.  In the Agreement, plaintiff agreed to release all "other claims, demands rights or causes of action, however designated, and all other claims and liabilities whatsoever, whether known or unknown, pending or not now pending, contingent or fixed, that Complainant has had, now has or hereafter may have."  Settlement Agreement ¶ 11. Any potential retaliation claim falls squarely within the category of claims plaintiff settled and released.  Plaintiff received $80,000 in consideration for releasing her claims, and she was represented by private counsel who signed the agreement.

## IV.    Even If the Court Were To Reach the Merits of the Retaliation Claim, Defendant Is Entitled to Summary Judgment for Count II.

Even if Count II were not barred by the Settlement Agreement, the Court would find that plaintiff has not come forward with evidence to create a genuine dispute of fact for the jury to determine as to whether she was retaliated against under FLSA.  Courts in this Circuit have used the *McDonnell Douglas* framework to evaluate FLSA retaliation claims that are based on circumstantial evidence.  *See, e.g., Sparrow v. WMATA*, No. 22-cv-2216, 2024 WL 3551962, at *11 (D.D.C. July 26, 2024); *Guerrero v. Vilsak*, 134 F. Supp. 3d 411, 428 (D.D.C. 2015).  To establish a prima facie case of retaliation under the FLSA, a plaintiff must show: (1) that she

engaged in protected activity, (2) that she was subjected to an adverse action by her employer, and

(3) that there is a causal link between the protected activity and the adverse employment action.

*Hicks v. Ass'n of Am. Med. Colls.*, 503 F. Supp. 2d 48, 51 (D.D.C. 2007); *Darveau v. Detecon,*

*Inc.*, 515 F.3d 334, 342 (4th Cir. 2008) ("[C]ourts have looked to Title VII cases in interpreting

the FLSA.").

Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case

of retaliation. *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). If the

plaintiff carries that burden, the burden shifts to the employer to proffer evidence of a

nondiscriminatory, nonretaliatory reason for the challenged action. *Id.* If the employer produces

such evidence, the burden shifts back to the plaintiff to produce evidence from which a reasonable

jury could conclude that the employer's reason was a pretext for unlawful retaliation. *Id.* But

when the employer comes "forward with a legitimate, non-retaliatory justification for [the

defendant's] actions," the burden-shifting framework falls away, and "the only question is whether

[plaintiff's] evidence creates a material dispute on the ultimate issue of retaliation." *Doak v.*

*Johnson*, 798 F.3d 1096, 1107 (D.C. Cir 2015) (internal citation omitted).[8]

---

8      The Court notes that plaintiff's retaliation claim would face challenges at every step of the prima facie analysis. To begin with, though she very well may have engaged in protected activity by filing internal complaints, submitting formal grievances with her union, and filing a complaint with the Office of Special Counsel, *see* Pl.'s Opp. at 84–88, plaintiff has not shown that many of the events she complains about rise to the level of a materially adverse action such that they might well "dissuade a reasonable worker from making or supporting a charge of discrimination." *Guerrero v. Vilsack*, 134 F. Supp. 3d 411, 426 (D.D.C. 2015). The one exception would be her claim that she was constructively discharged before she entered into the Settlement Agreement. But given the chronology of events and the fact that the alleged constructive discharge on April 2, 2020, occurred several years after the protected activity, plaintiff has not shown the temporal proximity that could support an inference of causal connection.

Courts in this district have generally required much closer temporal proximity to establish causation in the absence of direct evidence. *Benton v. Laborers' Joint Training Fund*, 121 F. Supp.

Here, defendant has come forward with a legitimate, non-retaliatory reason for discharging plaintiff: she "voluntarily entered into a Settlement Agreement (while represented by counsel) under which she agree to leave federal service for medical inability to perform her duties." Def.'s Mot. at 31; Settlement Agreement ¶ 5. It is undisputed that plaintiff was represented by counsel in negotiating and executing this agreement, and received $80,000, among other benefits, in consideration for her agreement to leave federal service.

Given defendant's proffered justification, the burden shifts back to plaintiff to point to facts in the record that raise a genuine dispute concerning the agency's motivation for discharging her.

3d 41, 60 (D.D.C. 2015) ("[T]he May and June 2013 complaints are simply too far removed from her May 2014 termination to support such an inference absent other evidence of causation.") And "when an employer comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive evidence beyond mere proximity is required.'" *Minter v. D.C.,* 809 F.3d 66, 71–72 (D.C. Cir. 2015).

Nor has plaintiff alleged sufficient facts to support a claim that she was constructively discharged as of April 2, 2020, as she maintains. Am. Compl. ¶ 35; *see also* Pl.'s Opp. at 46–51. "[A] constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign." *Walden v. Patient–Centered Outcomes Research Inst.*, 177 F. Supp. 3d 336, 346 (D.D.C. 2016) (alteration in original) (quoting *Katradis v. Dav–El of Wash.*, 846 F.2d 1482, 1485 (D.C. Cir. 1988)). Plaintiff must show "that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment." *Id.*, quoting *Douglas–Slade v. LaHood*, 793 F. Supp. 2d 82, 102 (D.D.C. 2011). "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job." *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006).

The same test would apply to an allegedly retaliatory environment. But here, rather than being dissuaded from "seeking remediation on the job," plaintiff took many steps to redress her workplace complaints during the time she was employed at the SBA, including by filing a series of grievances with her union and through internal agency channels to obtain reasonable accommodations for her PTSD, and to address other issues, all of which were ultimately resolved in the Settlement Agreement. Settlement Agreement ¶ 6 (listing five specific grievances that were released in the Settlement Agreement).

And on that point, plaintiff has a high threshold to overcome: she must point to evidence to show that the "desire to retaliate was the but-for cause of the challenged employment action," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Here, plaintiff offers nothing beyond conclusory statements and circular assertions. She resubmits many of the complaints that underlie her lawsuit in the first place, such as that "[d]efendant leveraged the accommodation/access process to impose disparate and stigmatizing conditions, then used those manufactured 'noncompliance' narratives to delay or block Ms. Lucas's return to work, compounding the harms already set in motion after her protected overtime and wage complaints." Pl.'s Opp. at 49; *see also id.* at 47 ("After the January 2018 wage dispute and escalating discipline, [d]efendant's pattern of using the accommodation process as a control mechanism did not end.").

Given the lack of a material dispute of fact on the issue of retaliation, the Court will grant summary judgment in favor of defendant on Count II.

### CONCLUSION

For the reasons set forth above, the Court will DENY plaintiff's partial motion for summary judgment [Dkt. # 76], and it will GRANT defendant's motion for summary judgment [Dkt. # 78]. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: July 10, 2026